-[L. A. No. 29624. In Bank. June 30, 1969.]

M. CRAIG MEDOFF, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Ball, Hunt, Hart & Brown, Joseph A. Ball and Albert H. Ebright for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law in this state for a period of six months as a result of his having prepared and filed in each of two divorce matters (being handled by him for the same client) an order to show cause and wife's declaration form,[1] knowing that his client's answer to question 10 in each declaration (i.e., that she had

---

[1]The form in question is one prescribed by the Los Angeles Superior Court for use by attorneys and their clients when seeking attorney's fees, court costs, alimony, allowances, custody of children, etc., pending termination of the main matter.

Petitioner was admitted to practice in 1952 and has been in private practice continuously since 1954, during which time he had handled many divorce matters. He is familiar with the form and has used it frequently.

not arranged to pay petitioner's fee and her court costs and had not paid any part of the fee) was false.

Petitioner was charged in three counts with professional misconduct in (1) violating his oath and duties as an attorney within the meaning of sections 6103 and 6128 of the Business and Professions Code and (2) committing acts involving moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code. The first two counts relate to the false answers given to question 10 of the wife's declaration filed in each of the two divorce actions. In the third count, petitioner was charged, in effect, with having instructed his client and her mother to testify falsely in court regarding the fee arrangement she had made with him.

In his answer in response to the notice to show cause filed herein, petitioner admitted that answers to question 10 in the declarations filed by him on behalf of his client were in error, but he claimed that in each instance the error was the result of an innocent mistake occasioned by faulty office procedures. Petitioner denied the allegations of the third count and alleged that he never intentionally "led any court to be misled in such matters."

The local administrative committee, after hearings on June 7 and July 5, 7, and 17, 1967, found that petitioner did not know that the answers to question 10 in the wife's declarations were false at the time he caused the declarations to be prepared or subsequently when they were filed with the court and found that petitioner had not instructed the client or her mother to conceal the fee arrangement or payment. The committee then recommended that the disciplinary proceeding against petitioner be dismissed. As one of its conclusions, however, the committee stated that the essential charges against petitioner in each count of the notice to show cause had been established by a preponderance of the evidence, but not by clear and convincing proof to a reasonable certainty in accordance with the standards established by this court in disciplinary proceedings.

The disciplinary board, after argument before it on August 14, 1968, unanimously (13-0) adopted revised findings, finding that petitioner knew that the answers to question 10 in the wife's declarations were false at the time he caused the declarations to be prepared and subsequently when they were filed with the court and wilfully caused them to be filed for the purpose of deceiving the court, and recommended that petitioner be suspended for a period of six months. The disci-

plinary board, as had the local administrative committee, found that petitioner had not instructed his client or her mother to conceal the fee arrangement or payment.

The record shows that in 1957 and again in 1961 Mrs. Charlotte Ellen Gehring employed petitioner to represent her in a divorce action against her husband, Stanley Leo Gehring, but that in each instance the parties were later reconciled. Petitioner charged a fee of $350 for his services on Mrs. Gehring's behalf in each of those matters, but had great difficulty collecting the fees.

In December 1964, Mr. Gehring filed a divorce action against Mrs. Gehring, and a property settlement agreement was executed. Mrs. Gehring did not file an answer, and the parties were later reconciled. The case was not dismissed, however. Petitioner was not involved in the action.

On November 22, 1965, Mrs. Gehring, after conversing with petitioner several times over the telephone, came by his office to talk with him about filing another divorce action on her behalf against her husband, having the property settlement agreement which she had executed in the action filed by her husband voided, and obtaining a dismissal of that action.

According to petitioner's testimony, he at first refused to represent Mrs. Gehring, but she pleaded with him to represent her and assured him that her estate had increased to half to one million dollars, that there was no possibility she and her husband would become reconciled this time, and that she would pay petitioner a generous fee if he would represent her.

Petitioner testified that at the November 22 conference, he told Mrs. Gehring that he would not represent her unless she paid him $10,000 cash in advance. She indicated that that would not be possible, and he then offered to represent her for $2,500 cash on account and a note and retainer agreement. Petitioner said that he ultimately agreed to accept $1,000 cash, payable on or before the date for the first court hearing, provided Mrs. Gehring first executed a note and retainer agreement for a $10,000 fee.[2] When asked if there had been any discussion what he would do in the event she was not able to pay the $1,000, petitioner stated they agreed he would not

---

[2]Petitioner testified in this respect: ". . . initially I wanted $10,000 cash, period, before I would lift a finger, period. Then it dwindled down to $2,500 cash on account of $10,000 before I would lift a finger. Then it dwindled down to a $10,000 note and $1,000 cash, payable as soon as possible but not later than my first appearance for her in court."

represent her further and would withdraw from the proceedings.

Petitioner further testified that at the November 22 conference he and Mrs. Gehring discussed the value of the parties' community property, and she presented to him documents showing values of $450,000 and $150,000, respectively, of two pieces of real property owned by them. She told him that the properties were actually worth more.

Mrs. Gehring executed a retainer agreement and a promissory note for $10,000, both of which were dated November 22, 1965. Under the retainer agreement, petitioner obligated himself to attempt to recover said sum from Mrs. Gehring's husband and agreed that to the extent he succeeded in doing so he would give credit to her.

In his verified answer to the disciplinary charges and in his verified complaint against Mrs. Gehring in a subsequent action on the note, petitioner stated that the agreement and the note were executed on the day they bore date. At the disciplinary hearing, Mrs. Gehring was uncertain of the exact date of execution, but stated positively that it was not November 22, 1965. In his testimony in these proceedings, petitioner stated that after hearing Mrs. Gehring's testimony and going through various documents, he had the "present belief" that the retainer agreement and the note were actually signed on or about November 26, 1965, after they had been typed from notes he had made on November 22, 1965. Petitioner stated that they were dated November 22, 1965, because that was the date he and Mrs. Gehring had agreed to their contents.

Mrs. Gehring paid petitioner $1,000 in cash, in accordance with their agreement; but there is a conflict in the evidence as to the date payment was made. No receipt was given to her for the money. Mrs. Gehring testified positively that she gave the money to petitioner on November 23, 1965. She stated that in making payment, she used part of the proceeds of a $1,500 cashier's check payable to her parents; and petitioner testified that she had informed him on November 22, 1965, that that was the expected source of her funds. Documentary evidence shows that on November 23, 1965, Mrs. Gehring cashed the check, receiving in return $1,000 in cash and a $500 cashier's check payable to her parents. It is also established that Mrs. Gehring saw petitioner at his office on November 23, 1965.

Petitioner testified at the hearing on July 5, 1967, that the money was paid to him December 13, 1965, but at the hearing

on July 7, 1967, he said it was paid on December 15, 1965.[3] According to petitioner, he did not deposit the $1,000 cash in the office account, but put it in his pocket for his personal use. He said that he was accustomed to carrying and using large sums of cash.

On December 2, 1965, petitioner filed a complaint for divorce on behalf of Mrs. Gehring against her husband in Los Angeles Superior Court case No. WED 8907. He also filed, on December 21, 1965, an answer and a cross-complaint in the earlier pending action (WED 7397) in which Mr. Gehring was the plaintiff.

In each of those cases, petitioner prepared and filed an order to show cause and wife's declaration. He drafted the one in WED 8907 (in which Mrs. Gehring was the plaintiff) while she was in his office on November 22, 1965. He testified that he completed answers on a blank form, which he used as a draft, and drafted on a piece of yellow foolscap paper exhibit A (relating to attorney's fees and the parties' manner and style of living) to be attached to the form. He then put the draft of the form and the draft of the exhibit in his "hopper," to be picked up later and typed by one of the secretaries. The completed document was filed December 2, 1965, and shows that it was signed by Mrs. Gehring under penalty of perjury on November 29, 1965.

In WED 7397, an order to show cause and wife's declaration (identical to the one filed in WED 8907 except for the caption and a transposition of the designations "plaintiff" and "defendant") was signed by Mrs. Gehring under penalty of perjury on December 20, 1965, and filed the following day. For the preparation of this document, petitioner turned over to one of the secretaries a copy of the order and declaration filed in WED 8907, instructing her to prepare a similar one in WED 7397, except to make the necessary changes regarding the designation of the parties. There is evidence that the typing was done in a rush around 6 p.m. at a time when the secretary was in a hurry to leave and Mrs. Gehring was waiting impatiently for the secretary to finish.

In each instance, petitioner is shown as the attorney for Mrs. Gehring, and question 10 of the declaration and the answer thereto appear, as follows: "10. Have you personally arranged to pay your attorney's fees in this case? *No.* How

[3] It is undisputed that Mrs. Gehring saw petitioner in his office on December 15, 1965, but no evidence that she saw him on December 13, 1965.

·much, if any, have you paid? *None.* Court costs? *None.*"
Exhibit A is referred to in paragraph 16 of the declaration
and consists of two parts. The first part, relating to attor-
ney's fees, seeks to justify a fee of $10,000.[4] In paragraph ·17,
a request is made for $10,000 for attorney's fees and $1,000
for court costs and accountant's and investigator's fees,
based on paragraphs 1 through 16. At the end of each form
appears a financial statement of the community assets.

Petitioner testified that although he usually proofread the
completed forms before having his clients sign them, he had
no recollection of reading either of the forms prepared for
Mrs. Gehring's signature before they were filed, and believed
that he had not read them. The court clerk called petitioner
by telephone to inform him that the form filed in WED 7397
had no points and authorities and that the provisions relating
to·child custody had not been completed. Petitioner thereafter
filed points and authorities and added in ink the desired pro-
visions regarding child custody, but he testified that even
though these errors had been called to his attention, he still
did not read the entire form.

On December 30, 1965, the two divorce matters (WED·7397
and WED 8907) were consolidated for a hearing on the two
orders to show cause and wife's declaration. They were
originally set for hearing on December 16, 1965, but were
continued at the request of Mr. Gehring's attorney. Petitioner

---

[4]The first part reads: "My husband and I have commenced three (3)
previous divorce actions; on each of those occasions and on numerous
other occasions, I have tried and tried to save our marriage and ·recon-
cile our differences—without success.

"I know now that a final divorce is inevitable and that in light ·of my
husband's pronouncements regarding his refusal to ever pay alimony and
to ever give me my fair share of our community property, this matter
will be *fully* and *hotly* contested, particularly with reference to alimony,
support, division of property and child custody.

"For these reasons, I have instructed MR. MEDOFF [petitioner], my
attorney, to fully investigate all such matters and to fully protect my
interests.

"MR. MEDOFF has already expended a great deal of time and energy
in investigation of assets, liabilities and facts involved in our marriage
and grounds for divorce and in conferences with me, advice, and prepara-
tion of documents.

"My husband and I have most of our assetry [*sic*], so far as pres-
ently known to me, invested in real property worth approximately
$750,000.

"In light of the value of assets involved, income of my husband (which
is approximately $20,000 a year), the time MR. MEDOFF has spent and
will spend on my behalf herein, and the probable difficulties involved, I
believe a ﹅fee of $10,000 is reasonable and proper herein and that pay-
ment of $5,000 on account thereof is reasonable and within the ability
of my husband to pay forthwith from cash in his possession or control."

had made a reservation to spend three days at the Alisal Ranch with his family, commencing December 27, 1965, and did not expect to be available for the hearing on the 30th. He therefore arranged for Mr. Mervyn Hecht, a young attorney who rented office space from him and occasionally handled legal matters for him, to represent Mrs. Gehring at the hearing. (Mr. Hecht later served as petitioner's counsel before the local administrative committee and the disciplinary board.)

Because of inclement weather, petitioner did not stay away as long as expected, and he was back by the morning of December 30. He went that morning to the courthouse in casual sport clothes and conferred with Mr. Gehring, Mr. Gehring's attorney, and Mrs. Gehring in an effort to settle the matter. No settlement was reached, and Mr. Hecht represented Mrs. Gehring at the hearing, as previously arranged.

Petitioner had not informed Mr. Hecht about the fee arrangement, and apparently there was no indication of the arrangement in the file, as Mr. Hecht said he had carefully gone over all the papers therein and seen nothing to indicate that the amount of petitioner's fee had been agreed upon. He testified that although he interviewed Mrs. Gehring at great length prior to the hearing, he did not discuss with her her answer to question 10. His explanation is, as follows: "My custom is when [petitioner] turned over this sort of a matter to me that he handled all of the attorney's fees discussions and I handled the substantive portions that he requested me to handle. I kept my nose out of his arrangements."

During the course of Mrs. Gehring's testimony at the hearing on the orders to show cause, the following proceedings occurred: "THE COURT: Referring to item 10 of your affidavit on attorney's fees since you signed it have you or has anyone else for you paid anything to your lawyers by way of a deposit or retainer fees or costs? THE WITNESS: No. THE COURT: That's still flat zero, right? THE WITNESS: Right." Mr. Hecht, of course, did nothing to correct the false testimony, since he did not know it was false. The court then ordered the husband, among other things, to pay the wife's attorney fees in the amount of $2,000.

Commissioner John R. Alexander, of the Los Angeles Superior Court, sat as a judge pro tempore at the hearing. He testified in the disciplinary proceeding that since his assignment to the Santa Monica Branch of the Los Angeles Superior Court in April 1963, petitioner's office had averaged a domestic relations case once every two or three months. He

further stated that by December 1965 he had adopted a fairly usual practice in conducting order to show cause hearings to ask the wife if she had paid her attorney any money after the date she signed the declaration and that sometimes the attorney would make a representation to the court in this respect. Commissioner Alexander indicated that he had a general recollection that either petitioner or Mr. Hecht, or perhaps both, may have made representations of this kind in other matters.

Mrs. Gehring conferred with petitioner on November 22, 23, and 26 and on December 15, 1965, before petitioner introduced her to Mr. Hecht, and she testified that at a conference before December 16, 1965, at which her mother was present, petitioner told her that under no circumstances was she to mention at the hearing the fact that she had paid him $1,000 cash and given him the promissory note. Mrs. Gehring's mother, Mrs. Green, also testified to this effect. (Mrs. Gehring testified that petitioner made such a statement three times, whereas her mother said he told them only once.) Petitioner denied that he told either Mrs. Gehring or her mother to conceal the fee arrangement or payment. As hereinabove indicated, both the local administrative committee and the disciplinary board found in his favor in this respect.

*Petitioner's account at the local administrative committee hearing on July 5, 1967*

Petitioner testified, in part, regarding his understanding of the purpose of paragraph 10 of the wife's declaration, expressing an awareness that disclosure of a fee arrangement between the wife and her attorney, or any payment by her, would affect the court's decision in awarding attorney's fees.

He further testified concerning his normal procedure of preparing the wife's declaration and completing paragraph 10 and as to his requiring a fee arrangement, with partial payment, before he would represent Mrs. Gehring, his making this clear to her at the commencement of their November 22 conference, and the nature of the fee arrangement they had agreed to at that time.

With respect to his preparation of the order to show cause and wife's declaration dated November 29, 1965, petitioner testified, in substance, that in his conference with Mrs. Gehring on November 22, 1965, he followed his usual practice in such matters of taking notes on a blank order to show cause and wife's declaration form; that, likewise in accordance with his usual practice, he made notes for exhibit A on yellow

paper; that after he took all this information, he and Mrs. Gehring agreed upon a fee arrangement; that he was not present on November 29, 1965, when she signed the typed order to show cause and wife's declaration, and he did not read it before she signed it; that he had no independent recollection regarding paragraph 10 of the wife's declaration; that he could not recall whether he even filled in paragraph 10; that he "presumed" if he left it blank, his secretary would have given a negative answer if she did not know about the fee arrangement; and that at the November 22 conference Mrs. Gehring had shown him records from which he formed an opinion at that time of the value of her community assets.

With respect to his preparation of the order to show cause and wife's declaration dated December 20, 1965, petitioner testified, in substance, that he gave his secretary an "inked in" copy of the first order to show cause and wife's declaration and instructed her to reverse the parties, and that he had no independent recollection of reading the second order and declaration before or after his client signed it or prior to its filing.

*Petitioner's account at the local administrative committee hearing on July 7, 1967*

Petitioner testified, in part, with respect to his normal procedure of advising a wife how to answer inquiries by the court and what to say regarding attorney's fees; his demand at the commencement of his conference with Mrs. Gehring on November 22, 1965, for fees and a fee arrangement before he would "lift a finger" for her; and the fee arrangement he and Mrs. Gehring agreed to on November 22, 1965.

Regarding his preparation of the order to show cause and wife's declaration dated November 29, 1965, petitioner testified, in substance, that he believed the sequence of events at his conference of November 22, 1965, with Mrs. Gehring took the following order: Mrs. Gehring desired to have petitioner represent her; he refused; she reassured him that her estate was large, and that she was a wiser girl and had no intention of reconciling with her husband or preventing petitioner from collecting adequate fees; she suggested executing the note, since she did not have cash; they discussed the order to show cause and wife's declaration, and petitioner prepared a rough draft of it, pulling Mrs. Gehring's old files and making notations on a blank form and on other paper; after the form was drafted in rough, they discussed fees "either further or entirely"; when he went through the second page of the

declaration (on which paragraph 10 appears), he told Mrs. Gehring that "they" would inquire of her needs and the ability of her husband to pay; he discussed this question as part of his general preparation of the form and probably told her that "they" would inquire regarding the subject of attorney's fees; he doubted he had suggested to Mrs. Gehring what her testimony should be on an inquiry as to attorney's fees, since they "had not yet come to an agreement on the fee"; he thought the reason was that his discussion of a fee arrangement would follow after he knew all about her assets; he did not know whether he had filled in paragraph 10, stating, "I doubt it was anything. I think it probably was planning"; he thought he probably went through the order and declaration with Mrs. Gehring, filled it in, and put the draft of the order and declaration in his "hopper" for typing before he proceeded to discuss fees in detail; and he put his draft on exhibit A in his "hopper" for typing at the same time as his draft of the order and declaration.

Petitioner testified that it was his standard procedure to determine fees at the time he made notes and filled in the draft of the order and declaration and that it was his usual practice, if a retainer agreement had been made, to include that information and sometimes to attach a copy of the agreement to the declaration. He also testified about the possibility that he may have left paragraph 10 blank and his secretary filled it in.

Petitioner was unable to produce his draft from which the secretary typed the final order and declaration of November 29, 1965, although he had his other drafts (i.e., the one used to prepare exhibit A attached to the form and the draft used to prepare the order and declaration executed on December 20, 1965).

On March 10, 1966, petitioner sent Mrs. Gehring a bill for $8,700, the amount which he claimed was due him under the retainer agreement and promissory note ($10,000 less credit for the $1,000 paid by Mrs. Gehring and $300 paid by her husband per court order). On April 11, 1966, he filed an action against her on the promissory note, praying for $8,700 and $66.10 costs. During the pendency of the case, Mrs. Gehring, through her attorney, threatened that she would go to the bar association unless petitioner settled the case against her. In October 1966, she brought the matter to the attention of the State Bar, and thereafter the present proceedings were instituted against him. On July 11, 1968, a judgment for

$5,200 was awarded to petitioner against Mrs. Gehring, by stipulation, in his action against her.

Petitioner points to certain discrepancies in the testimony given by Mrs. Gehring and argues that findings favorable to him made by the local administrative committee and the disciplinary board with respect to some of her claims show that her testimony was not credible. Arguing that petitioner's testimony was diametrically opposed to that of Mrs. Gehring, he suggests that "this test of credibility should persuade this Court to adopt the findings of the Committee that Petitioner did not prepare or file the OSCs with knowledge that they contained erroneous information and/or with the intent to deceive the court."

*Questions*: First. *Was there convincing proof to a reasonable certainty to support the disciplinary board's findings that petitioner knew that the declarations executed by his client contained incorrect answers to question 10 at the time he prepared them and filed them with the court, which findings were contrary to the findings of the local committee?*

██ *Yes.* As recognized by petitioner, this court passes upon the sufficiency and the weight of the evidence and is not bound by findings of fact of the local administrative committee or the disciplinary board, and the burden is on petitioner to show that the disciplinary board's findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Steiner* v. *State Bar*, 68 Cal.2d 707, 708 [1, 2] [68 Cal.Rptr. 729, 441 P.2d 289].)

██ As petitioner further points out, where the findings and recommendations rest primarily on conflicting testimonial evidence, and the findings of the local administrative committee and the disciplinary board are in conflict, the committee's decision is entitled to great weight, because the committe was in a better position than the disciplinary board or this court to evaluate conflicting statements and pass upon the credibility of the witnesses. Under such circumstances, this court is ordinarily reluctant to reverse the committee's decision. (*Zitny* v. *State Bar*, 64 Cal.2d 787, 790 [4, 5] [51 Cal.Rptr. 825, 415 P.2d 521].)

In the present case, however, petitioner's own testimony, when considered with the factual circumstances and the documentary evidence, establishes that he knew that the answers were incorrect at the time he prepared the drafts and filed the forms with the court. In view of such evidence, petitioner's attempts to show a lack of knowledge on his part of the

falsity of the answers in paragraph 10 are implausible and are not a sufficiently adequate explanation to dispel the conclusion that he acted knowingly and with an intent to deceive or mislead the court.

Petitioner testified that he made a definite arrangement with Mrs. Gehring for a $10,000 fee at his conference with her on November 22, 1965, at which he drafted the order to show cause and wife's declaration form to be filed in her divorce matter. He also said that he had told her at the outset of the conference that he would not "lift a finger" for her without a fee arrangement and assurance of a substantial cash down payment. Yet, he conferred with her that day for 2½ hours and drafted the lengthy declaration, with a detailed exhibit relating to a $10,000 fee claimed to be reasonable for his services. With respect to the amount of $10,000 for attorney's fees shown on the form itself, petitioner testified, ". . . my judgment is that the 10 was put in because I [had] already told her I wanted $10,000."

From his testimony it is clear that petitioner's primary interest, before representing Mrs. Gehring in another divorce action, was to make certain that he would receive a substantial fee and be able to collect it whether or not the parties reconciled again. By requiring the wife to execute a retainer agreement and a promissory note and pay $1,000 cash in advance, and then obtaining a court order against the husband for payment of fees, petitioner was providing himself with a substantial payment on account and with means to pursue legal remedies against both Mr. and Mrs. Gehring for collection of the fees. It seems clear, also, that petitioner did not want to run the risk of the court's possibly reducing the award to him from the husband because of the fee arrangement Mrs. Gehring had made with him.

Furthermore, although petitioner knew that the court would question Mrs. Gehring regarding an agreement to pay attorney's fees or any payment of such fees, he nevertheless arranged for Mr. Hecht to represent Mrs. Gehring at the hearing without advising him that a fee arrangement had been reached and a payment made, knowing that Mr. Hecht would not inquire into the matter but would rely on the answers in paragraph 10 of the wife's declarations.

Petitioner suggested a possibility that he left paragraph 10 of the wife's declaration blank and that his secretary filled it in, but his testimony indicates that such an occurrence was extremely unlikely. The following is his testimony in this

respect at the July 7 hearing: "Q. What about Question 10? A. Well, that normally would be filled in [by petitioner]. Q. What about when it wasn't filled in, would she [petitioner's secretary] fill it in herself? A. If she knew the information. For example, if there was a retainer agreement like might have been here she might have. Q. What would she do if she didn't know the information? A. I don't know what she would do, frankly. I suppose she would put none in. Q. Was there ever any occasion when you left Question 10 blank and she came up to you and asked you what she should put in there? A. Not that I can recall. I don't recall . . . ever leaving it blank." He also testified: "My recollection is that she [the secretary] has either before or since prepared O.S.C. forms which had blanks in it. She would normally consult me if there was any question about it."

Petitioner seeks to show that no payment was made prior to December 15, 1965, and that therefore, at least with respect to the order and declaration filed December 2, 1965, the answers were not false in showing that no payment had been made. The documentary evidence which petitioner says corroborates his testimony that the $1,000 payment was made December 15, 1965, consists of (1) an entry on his daily calender for that day, reading:

> "1:30   Charlotte Gehring
>           Forde wants cont OSC
>           $1000";

(2) an undated memorandum (with the upper left-hand corner torn off), reading:

> "Charlotte Gehring—advance on acct from mother
>                                            (deposit)—$1000
>
>           Justine please put
>           in cash receipts &
>           file";

and (3) an entry in his ledger dated December 15, 1965, showing the receipt of $1,000 on behalf of Mrs. Gehring.[5] The secretary to whom the memorandum was given, and who made the ledger entry, testified, however, that she did not know on what date the amount was actually paid to petitioner, and there is evidence that she was not current in her record keeping.

---

[5]The figures filled in later at the bottom of the page to show the total receipts do not include the $1,000, but allegedly a correction was made at a subsequent page in the ledger either the end of December or some time in January, when the error was discovered.

Petitioner contends that Mrs. Gehring's testimony on this issue was extremely suspect. He says that although admittedly she obtained $1,000 from the bank on November 23, 1965, and saw him that day, and there is therefore an inference she took it directly to him, an equally reasonable inference can be drawn from her testimony to support his contentions. Upon analysis, however, it does not appear that an equally reasonable inference to support petitioner's contentions can be so drawn.[6]

To infer that Mrs. Gehring obtained $1,000 in cash on November 23, 1965, with which to pay petitioner and then did not turn the cash over to him until three weeks later, even

---

[6]As pointed out by petitioner, Mrs. Gehring stated without equivocation that petitioner said three things when she paid him the money: (1) It would come in handy on his vacation, (2) he would put it in his safe, and (3) it was not his practice to give receipts and he would not give her one. Petitioner also refers to the fact that Mrs. Gehring testified that Mr. Bernard, a bank officer, called petitioner from the bank on November 23, 1965.

Mrs. Gehring's testimony regarding what petitioner said about using the money on his vacation is, as follows: ''He said he was probably going to take it and use it on his vacation because he had forgotten to go to the bank and get some money that particular day. . . . I remember he was leaving on vacation, and I remember he said it would probably come in handy, he would spend it that weekend because he couldn't get to the bank to get his own vacation money.'' (Italics added.)

Since December 27, 28, and 29, 1965, the dates of the vacation petitioner was planning to spend at the Alisal Ranch, fell on a Monday, Tuesday, and Wednesday, that vacation did not include a weekend. Furthermore, December 15, 1965, was 12 days before petitioner was due to leave, and it would appear unreasonable that he indicated at that time that the money would come in handy for him to use on the vacation trip, because he had forgotten to go to the bank that day to obtain money to use on the trip.

Although there is no evidence respecting any other vacation planned by petitioner, it should be noted that November 23, 1965, was the Tuesday before Thanksgiving, and if petitioner expected to use part of the money on a vacation trip ''that weekend,'' it would appear likely that the vacation trip referred to was not the one planned for December 27, 28, and 29.

Petitioner points out that he did not have a safe, from which it can be concluded he did not tell Mrs. Gehring he would put the money in his safe. He also says he did not say it was his practice not to give receipts. (Petitioner testified that he offered her a receipt, but that she stated she trusted him, and a receipt was unnecessary.) Even if, as contended by petitioner, Mrs. Gehring's testimony in these respects is not credible, such fact would not appear to be sufficient to dispel the inference that she paid him the money on the date she obtained it from the bank.

As for Mrs. Gehring's testimony regarding the telephone call from Mr. Bernard at the bank on the day she cashed the check, it should be noted that petitioner's evidence did not prove that no such call was made. The telephone call record book which he introduced in evidence is entitled ''Phone Calls—'While Out' Record.'' On the copies of some of the calls appears a notation, ''You talked,'' thus showing that the record was not limited to calls received while the attorney was out. However, petitioner's

though she saw him on November 23, and November 26, would not be reasonable, particularly if, as claimed by petitioner, he was pressuring her to make payment as soon as possible and threatening not to appear in court for her unless he had the $1,000 on or before December 16, 1965.[7] Under the circumstances, the inference that Mrs. Gehring paid the money to petitioner on or about November 23, 1965, is the only reasonable one to be drawn.

It should be observed that the local administrative committee did not indicate that it questioned the credibility of the witnesses against petitioner or that it found the evidence against him unworthy of belief. Rather, it indicated that in its opinion the evidence was sufficient to sustain the charges against petitioner by a preponderance of the evidence. ■ However, since evidence to sustain charges against an attorney in a disciplinary proceeding must be by clear and convincing proof to a reasonable certainty (*Moore* v. *State Bar,* 62 Cal.2d 74, 79 [2] [41 Cal.Rptr. 161, 396 P.2d 577]), and the committee concluded that this standard had not been met, it recommended that the proceeding be dismissed.

Petitioner cites *Werner* v. *State Bar,* 13 Cal.2d 666 [9 P.2d 881], in which after the local administrative committee had found that there was no legal evidence to sustain a charge of solicitation, the Board of Governors, without taking any further testimony, made contrary findings and recommended that the attorney be suspended for a period of six months. This court reversed, pointing out that the committee's finding as to the truth of the charges, having been based on personal contact with the attorney and the other witnesses in the case,

---

secretary testified, in part, with respect to the record, ". . . and every time *a client* calls in we make a note that they have called and what the message is. The original goes to the attorney and then back into the client's file, and the copy of it stays in the book." (Italics added.) The bank officer apparently was not a client, and evidence that no call from him on that day was listed in the telephone call record book would therefore not appear to establish conclusively that he did not call. Furthermore, documentary evidence establishes that the check was cashed November 23, 1965.

[7]Petitioner testified: "Well, I said I wanted it [the $1,000] as fast as possible and preferably forthwith. She said she didn't have it, she would have to get it from her mother and father. She said she knew that her mother and father had it in the refrigerator in the form of a certified or cashier's check made payable to them in the amount of $1,500. She felt very confident she could get $1,000 from them, and I pressed her as to when she would come up with the $1,000 because I kept reassuring her I would not rely upon the retainer or note alone, and I wanted some payment on the account of good faith, and I insisted upon a minimum of $1,000, and that if I didn't have the $1,000 on or before the hearing date of December 16th I would not appear in court for her."

was entitled to the court's respectful consideration. The conclusion was reached that none of the charges against the petitioner had been sustained by the evidence, and the proceeding was therefore ordered dismissed.

In *Werner*, however, as pointed out by the local administrative committee, there was no legal evidence to sustain the charges; there were merely some suspicious circumstances. Such is not the situation here, where, as hereinabove indicated, there is sufficient evidence to sustain the charges against petitioner. ■ It should be noted incidentally, that it is not required that petitioner's guilt be established by direct evidence. Circumstantial evidence is sufficient. (*Utz* v. *State Bar*, 21 Cal.2d 100, 103 [130 P.2d 377].)

Second. *What discipline should be imposed?*

■ Under the facts shown herein, petitioner should be disciplined, but we have concluded that a 60-day suspension is adequate.

It is ordered that petitioner be suspended from the practice of law for a period of 60 days, the order to become effective 30 days after the filing of this opinion.