[L.A. No. 29839. In Bank. Apr. 27, 1972.]

ALBERT MARTIN BERNSTEIN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Albert Martin Bernstein, in pro. per., and James P. Cantillon for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding under Business and Professions Code section 6083, subdivision (a) and rule 59(a) of the California Rules of Court, to review a recommendation of the State Bar Disciplinary Board. The petitioner, Albert Martin Bernstein, was admitted to the practice of law in this state on June 11, 1958. He has no prior record of discipline.

Local Administrative Committee Number 26 for Los Angeles County found that petitioner wilfully violated rule 9 of the State Bar Rules of Professional Conduct by commingling his clients' funds with his own. It further found that he converted his clients' funds to his own use, an act of moral turpitude which is cause for suspension under section 6106 of the Business and Professions Code. The local committee recommended that petitioner be placed on probation for one year on the condition, among others, that he be suspended from the practice of law for 30 days. The Disciplinary Board of the State Bar adopting the committee's findings with one minor amendment,[1] changed the recommended discipline to six months'

---

[1] The local committee found that Bernstein had paid an investigator from the recovery without his clients' permission. The board concluded that the clients received a larger share of the recovery than that to which they were entitled under the agreement regardless of whether it provided for this payment.

actual suspension with no probationary period. As explained below, we conclude that a 30 days' suspension is appropriate.

The complaining witnesses, Mr. and Mrs. George Nielsen,[2] were injured in a two-car collision on July 27, 1966. They were passengers in a car driven by Frank Novak. After the accident the Nielsens retained an attorney to obtain a recovery from the driver of the other car, but they became dissatisfied with his services. On April 6, 1967, they asked Bernstein to take over the case. He agreed, and the parties signed a contingent fee contract giving Bernstein 45 percent of the recovery if a suit was commenced.[3]

Bernstein later obtained a police report of the accident which, contradicting the Nielsens' story, concluded that Novak's car had been involved in a speed contest at the time of the accident. To aid him in the case, which he now considered difficult, Bernstein hired as an "investigator" David Gornel. Gornel apparently participated in the negotiations with Farmers Insurance and likewise did some investigative work. According to Bernstein the Nielsens agreed to pay Gornel's fee of $200 from their share of the recovery. The Nielsens deny making this agreement.

On April 15, 1967, George and Verna Nielsen signed a form of lien authorizing and directing Bernstein to pay their medical bills directly from any recovery. The Nielsens testified that they told Bernstein that they desired only to see that their medical bills were paid, and expected no other recovery. The medical bills eventually totalled approximately $1,000.

On August 23, 1967, Farmers Insurance issued two drafts totalling $3,500 in settlement of the Nielsen claim. On August 25, the clients met with Bernstein in his office. They signed the release forms and endorsed the drafts.[4]

Bernstein testified that he explained to the Nielsens that the drafts would

---

[2] At the time petitioner first met Mrs. Nielsen, she was still Miss Verna Wines.

[3] Bernstein testified that the fee was set with the understanding that the prior attorney would share a portion of it in payment for the services he had already rendered. Subsequently petitioner learned that the prior attorney had filed a complaint for the Nielsens on April 5. The clients then executed a substitution of attorneys.

[4] The Nielsens testified that they signed the forms only because they believed that the medical bills would be paid in addition to the $3,500. They offered no explanation for their new expectation of an increased recovery. They also testified that they did not meet Bernstein on August 25 until after they had signed the release forms and the checks, and that a third person, apparently Gornel, handled these transactions in Bernstein's office. Bernstein denied that Gornel was present at the August 25 meeting, and also insists that he told the Nielsens before they signed the release forms that the medical bills would be paid from their share of the $3,500.

require seven to ten days to clear. Since the Nielsens wanted their money immediately, Bernstein offered to deposit the drafts in his personal account and write checks to the Nielsens that the bank would immediately honor.

At the Bank of America Bernstein deposited in his personal account the insurance company drafts, less $100 for his personal use. He testified that he saw no impropriety in this procedure since he intended immediately to pay both the clients and the doctor bills in full. According to Bernstein's testimony, following the deposit he conferred with the clients at the bank, calculating on a piece of paper the division of the recovery. The Nielsens then expressed displeasure at the size of their share, which would have been approximately $660 after deducting both the doctor bills and medical costs as well as Gornel's $200 fee. The Nielsens suggested that Bernstein could recover medical costs from Novak's insurer, State Farm. Bernstein suggested that the three of them return to his office to discuss the matter further.

At the office Bernstein agreed to negotiate with State Farm but told the Nielsens he would retain all the funds until the conclusion of negotiations. When the clients objected that they wished to go to Las Vegas that weekend, Bernstein advanced them $200. As to this entire episode, the Nielsens testified only that despite their requests Bernstein would not give them more than $200. Bernstein also wrote a $200 check to Gornel on the same day.

Bernstein testified that by the conclusion of these discussions with the Nielsens on August 25, the bank had already closed, and that by inadvertence he subsequently neglected to transfer the remaining funds to a clients' trust account that he maintained at the same bank. Bank records show, however, that Bernstein's trust account had been closed the previous June. The record does not indicate if Bernstein had a trust account at another bank at this time.

On September 14, Bernstein paid George Nielsen an additional $500 from his personal account. By December Bernstein had still neither paid the medical bills nor settled with State Farm, and the Nielsens complained to the State Bar. On December 12, 1967, the bar wrote Bernstein advising him that the Nielsens would appreciate further information.

Bernstein replied on December 14 enclosing copies of his correspondence with State Farm, and the lien form signed by Mr. Nielsen. He wrote that if State Farm did not honor the Nielsens' claim he would attempt to settle with the doctors. He offered to cease his negotiations with State Farm and pay the doctors from the original recovery if the Nielsens desired.

Bernstein's account at the Bank of America, however, was consistently

overdrawn. Although there was a positive balance immediately following the August 25 deposit, the account was overdrawn again on September 18. It remained so through October 25, 1967, the last day for which the record includes a statement of the account. The highest balance in Bernstein's account between October 2 and October 25 was a −$2,031.20, on October 2; the lowest was a −$7,771.20, on October 9. The gist of Bernstein's explanation at the disciplinary hearings was that his clients' funds were not endangered because of his arrangement with the bank for "carte blanche" credit. He also claimed that "bookkeeping-wise" he was still holding the $1,000 to pay the Nielsens' bills.

On May 2, 1968, Bernstein wrote another check to George Nielsen, for $100, bringing the total he had paid Nielsen to $800. This check was drawn on an account that was apparently a personal one at the Independence Bank. Yet Bernstein had still not paid any of the Nielsens' doctor bills. A week later Bernstein settled with State Farm, obtaining an additional $609. He deposited the State Farm payment in a clients' trust account at the Independence Bank and wrote a check on that account to George Nielsen for the full $609, without deducting any portion for a fee.

The Nielsens complained again to the State Bar because of the unpaid medical bills. On November 26, 1968, the bar again wrote to Bernstein, requesting a complete accounting of the funds. The bar letter itemized $1,073.05 of medical bills still unpaid.

The bar received Bernstein's reply on January 16. In reply, Bernstein wrote that he had not been able to ascertain the amount that was paid "by the insurance carrier" until December 20, 1968. This statement presumably refers to State Farm, as Bernstein had told the bar in his previous letter of payments to the Nielsens from the Farmers Insurance recovery. In fact, Bernstein had settled with State Farm on May 13, 1968, and deposited their payment in his clients' account on May 15.

The reply also included a rather incoherent accounting of the funds. Noting that the total recovery was $4,109, Bernstein calculated his own fee at 45 percent, to be $1,849. This fee included 45 percent of the State Farm recovery which he had previously paid in full to the Nielsens. He then apparently deducted the fee, $1,073 in medical bills, and $247.14 in costs, from the $4,109, and concluded that the remaining $939.86 was the amount he owed the Nielsens. It then appears that he deducted this figure from $1,300, listed as "paid to clients," concluding that the Nielsens should refund to him $360.14. Bernstein had actually paid his clients $1,409 by this time, the three initial checks totalling $800 and the State

Farm payment of $609. He recognized this fact on the second page of his letter when he referred to the "$1,400 eventually obtained by the Nielsens."

Bernstein ended the letter by noting that "we are presently sending to the doctors involved checks for the monies outlined in your letter of November 26, 1968." Despite this representation, the bills were not paid in full until at least July 9, 1969, six months later. Bernstein made one payment of $287.05 on June 9, 1969, and a second payment of apparently $696 on July 9, 1969. The record does not indicate the date of the final payment of $90 owed the Southeast Doctors Hospital.

The local administrative committee sent Bernstein a notice to show cause on December 17, 1969. Hearings were held on April 2 and 16, 1970; the Nielsens and Bernstein testified. The local committee found no basis for the following charges included in the notice: a) that Bernstein had known that the Nielsens' prior attorney had already filed suit in the matter, but nevertheless wilfully inserted in his agreement with the Nielsens a misleading provision that provided for a 40 percent fee if no suit was commenced; b) that Bernstein wilfully failed to pay promptly his clients' medical bills in violation of an agreement with his clients; c) that Bernstein had wilfully failed to provide his clients with an accounting of the trust funds.

The local committee found that Bernstein had wilfully failed to deposit and maintain a portion of his clients' funds in a clients' trust account, and that he had wrongfully taken a portion of their funds for his own use. The committee also found that Bernstein had represented to the Nielsens that he would pay the medical bills from the proceeds of the Farmers Insurance Group recovery but did not pay them promptly. The committee declined to find that Bernstein wilfully failed to pay the bills, however, because "of the unresolved question as to what authority he had from his clients on the subject." The committee apparently concluded that the Nielsens may have agreed to delaying payment while awaiting settlement of the State Farm claim.

The State Bar Disciplinary Board adopted the findings of the local committee with one exception: the board deleted a finding that Bernstein had taken more than the agreed fee by deducting Gornel's fee from his clients' share. The board concluded that Bernstein received less than his agreed fee regardless of the inclusion of the payment to Gornel. The board, however, rejected the committee's recommended discipline of one year suspension, with execution stayed on condition of probation including actual suspension for the first 30 days, and recommended instead actual suspension for 6 months.

Petitioner here raises two questions. He contends first that on an "appeal" from the local committee's judgment the disciplinary board may not impose a greater penalty than that imposed by the committee. He further urges that the discipline recommended by the board, six months actual suspension, is too severe for these violations of the rules.

Petitioner's first contention obviously cannot prevail. This proceeding does not constitute a criminal one; it proposes, instead, to determine the fitness of an attorney to practice law (*Eschwig* v. *State Bar* (1969) 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662]; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 637-638 [21 Cal.Rptr. 589, 371 P.2d 325]); petitioner's reference to cases construing rights in criminal appeals do not apply. The hearing before the disciplinary board does not compose an appeal from the local committee's findings; the findings serve only as recommendations to the board; the board may render findings of fact and draw conclusions from such findings at variance with the committee's. (*Trusty* v. *State Bar* (1940) 16 Cal.2d 550, 551-552 [107 P.2d 10]; *Bruns* v. *State Bar* (1941) 18 Cal.2d 667, 668 [117 P.2d 327].) Although we give great weight to the local committee's findings that resolve conflicts in the testimony (*Medoff* v. *State Bar* (1969) 71 Cal.2d 535, 546 [78 Cal.Rptr. 696, 455 P.2d 800]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521]), both the board and this court reach an independent judgment on the record before it. (Bus. & Prof. Code, §§ 6078, 6086.5; rules 38-42(a), 80-89, Rules of Procedure of the State Bar.)

Petitioner's characterization of the hearing before the board as an appeal entirely misconceives its nature. He chose not to accept the committee's findings, and the board held a hearing at which petitioner appeared with counsel. Petitioner cannot limit the board's exercise of its independent judgment by converting the proceeding into an appeal. Since the board on its own motion may hold a hearing and modify the committee's recommendations (rule 38.5, Rules of Procedure of the State Bar), it may certainly do so after petitioner has requested a hearing.

We first consider the nature of petitioner's transgressions of State Bar rules. The facts show a clear violation of rule 9 of the Rules of Professional Conduct, which provides in part that "[a] member of the State Bar shall not commingle the money or other property of a client with his own . . . ." In *Peck* v. *State Bar* (1932) 217 Cal. 47, 51 [17 P.2d 112], the court explained the rationale of this rule: "This salutary rule was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money. Moral turpitude is not necessarily

involved in the commingling of a client's money with an attorney's own money if the client's money is not endangered by such procedure and is always available to him. However, inherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of a client's funds, and as far as the client is concerned the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances beyond the control of the attorney."

The present case well illustrates the soundness of that rationale. Petitioner contends that he did not "wilfully" commingle and that the Rules of Professional Conduct proscribe wilful violations only. Yet clearly petitioner's behavior of maintaining his clients' funds in a personal account which he rapidly exhausted must be considered wilful. Even if petitioner did not actually intend to endanger his clients' funds by such action, his motivation does not diminish the seriousness of the infraction. Petitioner's explanation that he somehow had a "bookkeeping entry" segregating his clients' funds does not suffice to excuse him, nor does his explanation that he had "carte blanche" credit with the bank. Petitioner's clients cannot be asked to rely on his maintenance of continued personal credit with his bank as security for their funds.[5] The very purpose of rule 9 is to protect the public from just such irregularities as occurred here.

The evidence sustains the finding of the State Bar that petitioner wrongfully used and converted to his personal use for a period of time a portion of the funds which he received as trust funds for his clients Verna Wines and George Nielsen. We conclude that petitioner deposited the Nielsens' trust moneys in his personal checking account and used them for his personal obligations.

Petitioner contends that he had entered into an agreement with his clients that he would hold part of the funds for payment of the medical expenses. At the threshold we point out that even assuming the validity of petitioner's contention, the funds which he received, impressed with a trust, should have been held inviolate and separate from his own.

If we do, however, probe petitioner's contentions as to the handling of the medical expenses we must conclude that his explanations are entirely unclear. The implication of Bernstein's testimony is that his clients, dissatisfied with their share, wanted part of that portion of the Farmers Insurance recovery allocated to the doctor bills. The Nielsens assumed he would rely on a subsequent recovery from State Farm to meet the

---

[5]In fact, petitioner testified that he ultimately terminated his relationship with the Bank of America. The record does not include the reason.

medical obligations. Bernstein, however, conditioned his pursuit of the State Farm claim on their agreement that the Farmers Insurance funds be held until the status of the State Farm claim could be determined. Bernstein seeks to convey the overall impression that he was in fact protecting the medical claims by holding his avaricious clients to their original agreement.

There are, however, difficulties with the story. As Bernstein admitted at the disciplinary hearings, he could just as well have paid the medical bills and continued to pursue the State Farm claim. His deposit of the funds in a personal account, which he then exhausted, makes inescapable the conclusion that he sought, instead, to use the funds himself.

The Nielsens testified that they repeatedly endeavored to induce Bernstein to pay the bills. They claimed that they told Bernstein this was all they wished from their claim. Yet this testimony is inconsistent with their other assertion that they would not have signed the Farmers Insurance release forms had they not been misled into believing that the recovery included $3,500 in addition to the medical payments.

As to Bernstein's rather obscure account of the medical expenses we are inclined to concur in the following finding of the State Bar: "Said medical bills were not paid promptly because of a dispute between Respondent Albert Martin Bernstein and his said clients, and each of them, regarding whether Respondent Albert Martin Bernstein should pay said medical bills from the proceeds of the drafts issued by Farmers Insurance Group and when, or from drafts issued by the medical payments carrier, State Farm Insurance, or at all. The committee does not find that Respondent Albert Martin Bernstein wilfully failed to promptly pay said medical bills, and makes this finding of fact on the basis of there being a question as to what authority Albert Martin Bernstein had on this subject from his clients."

■ We must finally determine, then, the discipline to be imposed upon petitioner. In so doing we do not overlook such factors as the following: his conduct ultimately caused no loss to other parties (*Paine* v. *State Bar* (1939) 14 Cal.2d 150, 154 [93 P.2d 103]); the Nielsens, indeed, received at least as much as was due them; the frequent changes in their testimony and stated position, disclose the difficulty of dealing with them (cf. *McGrath* v. *State Bar* (1943) 21 Cal.2d 737, 741 [135 P.2d 1]; *Hildebrand* v. *State Bar* (1941) 18 Cal.2d 816, 834 [117 P.2d 860]); petitioner's lack of a record of prior misconduct works in his favor.

On the other hand, the record shows petitioner's professional misconduct continued from August 1967, for a period of two and a half years despite

three intercessions of bar proceedings in an attempt to resolve the matter. Such misconduct involved petitioner's commingling and use of trust monies belonging to the Nielsens; his misleading the Nielsens that he held their funds in trust for payment of their doctor bills, although in fact he had commingled their monies; his affirmative misrepresentations to the State Bar to conceal the true situation, and his lack of candor in testifying before the local administrative committee.

The imposition of penalty does not issue from a fixed formula but from a balanced consideration of the relevant factors. We start at least from the premise that petitioner's infractions of commingling of the funds and concomitant misuse of funds compel discipline. The investigating committee fixed the penalty as one year suspension with actual suspension of 30 days. The Disciplinary Board of the State Bar, although it rejected the committee's finding that petitioner had wrongfully deducted from the clients' recovery the amount of some $200 which he had paid to Gornel, increased the penalty to six months' actual suspension. The difference between the 30 days' and six months' actual suspension is a rather extensive and striking one.

Since petitioner's clients actually received more than their share of the recovery, since the medical bills were paid, and since no one involved suffered any financial loss, we hold that the offense of commingling should call for an actual suspension of 30 days.

It is ordered that petitioner be suspended from the practice of law for the period of 30 days. This order shall be effective 30 days from the date of the filing of this opinion.

Petitioner's application for a rehearing was denied May 23, 1972.