[S.F. No. 23945. Oct. 4, 1979.]

JOSEPH A. JACKSON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Carl B. Shapiro and Shapiro, Shapiro & Shapiro for Petitioner.

Herbert M. Rosenthal and Darlene Marie Azevedo for Respondent.

## OPINION

**THE COURT.**—Petitioner, Joseph A. Jackson, was admitted to the practice of law on December 16, 1941. By an order filed February 28, 1979, we suspended him from the practice of law for a period of five years. (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509 [153 Cal.Rptr. 24, 591 P.2d 47] (*Jackson I* ).) Execution of the suspension order was stayed and petitioner was placed on probation for that period on condition that he be actually suspended for the first three years thereof.

In the present proceeding the record clearly discloses a pattern of professional misconduct in two matters (the Sillard and Layton matters) over a period of six years (March 1970 through February 1976), and for the reasons set forth below we conclude that disbarment is necessary to protect the public and to maintain public confidence in the courts and the legal profession. Petitioner concedes the following facts to be substantially correct:

### I. *The Sillard Matter*

In 1967 petitioner was retained to represent Harry J. Sillard and Rodney Sillard, minors, in litigation regarding their rights in a decedent's estate. Guardians of the estates of the minors were, first, Harry M. Sillard and later Rose Sillard. Prior to the conclusion of the litigation the minor Harry J. died and the administrator of his estate was substituted as a party. Petitioner received funds which he held in trust for his clients and his misconduct consists of his repeated refusals to pay Rose, as their representative, the funds which he had misappropriated. In order finally to secure payment, Rose was required to institute lengthy legal proceedings which continued over a period of three years.

In February 1972, Rose filed a petition for a citation against petitioner in the guardianship estate of Rodney and a complaint in the estate of the deceased Harry J. Each pleading alleged, in essence, that petitioner was holding $6,214.51 for the benefit of the estate and that despite repeated demands he refused to deliver the funds. The actions were consolidated and referred to the probate commissioner who on December 19, 1973, determined that petitioner was indebted, as of March 7, 1972 (the date of the commissioner's hearing), to the guardian estate of Rodney in the sum of $756.26 and to the estate of Harry J. in the sum of $3,283.71. After notice and hearing, at which petitioner did not appear, the San Francisco

Superior Court entered judgment against petitioner in each of the two proceedings in the amounts determined by the probate commissioner.

The judgment against petitioner for $756.26 was entered in superior court in favor of the guardianship estate of Rodney on April 8, 1974. On September 16, 1974, pursuant to a writ of execution, the judgment in favor of Rodney was satisfied in full by a levy on petitioner's personal bank account.

The judgment for $3,283.71 against petitioner and in favor of the estate of Harry J. was filed on April 1, 1974, but was not entered until September 16, 1974, because petitioner, in an unsuccessful attempt to have the judgment modified or set aside, filed a motion for new trial on April 12, 1974, and corresponded on several occasions with the judge.

In October 1974, Rose caused a levy to be made on petitioner's personal bank account, but the writ was returned unsatisfied.

In July 1975 petitioner made his first payment to the estate of Harry J. on the judgment entered nine months earlier. During the period July 1975, to February 1976, he made payments totalling $1,400. The State Bar preliminary hearing in this matter was held on April 22, 1976, and thereafter, on July 15, 1976, petitioner paid the $2,616.40 balance due on the judgment.

In addition to refusing repeatedly to transfer the Sillards' funds to them, petitioner also misappropriated funds held for them in a clients' trust account. According to the probate commissioner's report, as of March 7, 1972, petitioner was indebted to Rodney for $756.26, and to the estate of Harry J. for $3,283.71, a total obligation of $4,039.97. These amounts were reduced to judgment. Thus, at all times from March 7, 1972, to September 16, 1974 (the date Rodney's judgment was satisfied by levy), petitioner should have had at least $4,039.97 in his trust account. However, during this period petitioner's trust account was overdrawn for a total of 30 days and dropped below the amount owed to these clients alone for periods exceeding, in total, 9 months. Petitioner explained the overdraft on August 19, 1974, as "my girl's fault" even though he was the only person authorized to sign checks against the account. As of September 16, 1974, petitioner's obligation to Rodney was satisfied and so his total obligation to these clients was reduced to the $3,283.71 judgment in favor of the estate of the deceased Harry J. However his trust account

balance was insufficient to meet the balance due on the obligation on numerous occasions before it was finally paid on July 2, 1976.

## II. *The Layton Matter*

In 1972 Mrs. Pearl Layton became the beneficiary of a promissory note secured by a second deed of trust on real property. The note and trust deed provided for default and an acceleration of the principal balance due if payments on the first trust deed were not maintained on a current basis. In June 1974, a notice of default of the first trust deed was recorded and on June 17, 1974, Mrs. Layton was so notified. On July 2, 1974, a notice of default of the second trust deed was recorded.

On October 24, 1974, Mrs. Layton learned that the obligor on the note had sued the sellers of the property over an alleged misdescription of the property boundaries, the result of which litigation would affect the property interest which Mrs. Layton would receive were she to proceed with the foreclosure on the junior encumbrance.

Mrs. Layton then engaged petitioner to protect her interests and paid him $100 on account of a retainer fee on November 4, 1974, and $150 on December 16, 1974. Petitioner promptly negotiated an agreement with the debtor's attorney whereby the debtor would keep current his payments on the note secured by the first trust deed, and Mrs. Layton would postpone her foreclosure sale until the litigation could be resolved.

The debtor's lawsuit was settled in early 1975 and as a result of the settlement petitioner received $2,500 on behalf of Mrs. Layton which was deposited in petitioner's client trust account on May 21, 1975. Petitioner twice acknowledged in writing that the $2,500 was held in trust for Mrs. Layton—once in a letter of June 6, 1975, and again in a letter to Mrs. Layton on February 26, 1976. Thus, during the period May 21, 1975, through February 27, 1976, petitioner should have had in his trust account at all times at least $2,500. However, on October 10, 1975, the balance of his trust account fell to $59.16. Further, during the periods July 9, 1975, through July 22, 1975, and September 5, 1975, through October 12, 1975, a total of 53 days, the balance of petitioner's trust account was less than $2,500. Petitioner's explanation for this was that he had "unintentionally overdrafted my trustee account." Mrs. Layton testified that she had never authorized any expenditures from the trust fund for any purpose and had never agreed to lend any of the money to petitioner.

Petitioner apparently withheld Mrs. Layton's money because she refused to pay him additional attorney's fees. Mrs. Layton testified that she knew that the $250 retainer she had paid would not cover all of petitioner's fees. On August 15, 1975, he received an additional $1,500 in attorney's fees through a demand on the title company, but he continued to withhold payment of Mrs. Layton's $2,500.

Between August 15, 1975, and February 1976, Mrs. Layton tried unsuccessfully to obtain her money from petitioner who responded only by asserting that he was entitled to additional attorney's fees. On February 26, 1976, petitioner sent Mrs. Layton a check for $1,750, accompanied by a letter acknowledging that he held the funds in trust, but claiming his right to withhold $750 for additional fees. The letter also offered to arbitrate the fee before the bar association if Mrs. Layton objected to it. However, despite Mrs. Layton's prior refusal to pay additional fees, and despite her objections, petitioner testified that he "mentally" paid himself the $750 on February 26, 1976.

Mrs. Layton negotiated the check, but refused to execute the release which accompanied it. Her repeated efforts to contact petitioner about the $750 were unsuccessful. So far as the record reflects, the dispute has not been resolved and petitioner has retained the money.

■ The evidence clearly establishes that petitioner repeatedly violated both the trust placed in him by his clients and the tenets and ethics of his profession. It is undisputed that on numerous occasions when petitioner should have had substantial sums in his trust account for the benefit of his clients, the actual balance of this account was substantially lower, and on several occasions, his trust account was overdrawn. ■ The fact that the balance in an attorney's trust account has fallen below the amount due his client will support a finding of wilful misappropriation. (*Brody* v. *State Bar* (1974) 11 Cal.3d 347, 349-350 [113 Cal.Rptr. 371, 521 P.2d 107]; *Black* v. *State Bar* (1972) 7 Cal.3d 676, 691 [103 Cal.Rptr. 288, 499 P.2d 968].) ■ Evidence that an attorney repeatedly refused to account to the heirs of an estate in face of repeated demands that he do so, as was true in the Sillard matter, will also justify a finding of wilful misappropriation. (*Jackson I,* at p. 513; *Brody* v. *State Bar, supra,* 11 Cal.3d at pp. 349-350.) ■ There was abundant evidence of both types of misconduct on the part of petitioner and this alone would constitute a basis for disbarment. (*Oliver* v. *State Bar* (1974) 12 Cal.3d 318, 321 [115 Cal.Rptr. 639, 525 P.2d 79].)

In addition to breaching his fiduciary duty to his clients by his mismanagement of his clients' trust account, petitioner also refused to respond to repeated demands by his clients for return of their money, claiming that he had incurred additional attorney's fees and costs. In the Sillard matter petitioner's claims for fees were litigated before the probate commissioner but even after final judgments were entered before the superior court petitioner still refused to transmit the funds belonging to his clients. In the Layton matter petitioner withheld $750 from his client, claiming additional attorney's fees and the record supports the conclusion that such refusal was made wilfully and in bad faith. ■ An attorney is not permitted unilaterally to determine the amount of his fee and withhold it from funds held in trust over his client's objection. . (*Greenbaum* v. *State Bar* (1976) 15 Cal.3d 893, 899 [126 Cal.Rptr. 785, 544 P.2d 921]; *Brody* v. *State Bar, supra,* 11 Cal.3d at p. 350; *Crooks* v. *State Bar* (1970) 3 Cal.3d 346, 358 [90 Cal.Rptr. 600, 475 P.2d 872]; *Most* v. *State Bar* (1967) 67 Cal.2d 589, 597 [63 Cal.Rptr. 265, 432 P.2d 953].) ■ Petitioner's conduct in this regard is specifically prohibited by rule 8-101(A)(2), Rules of Professional Conduct.

Petitioner's breach of professional ethics also included the commingling of funds. Petitioner testified that for several years preceding the hearing on June 27, 1977, petitioner followed the practice of depositing all of his personal funds, including earned fees, into the trust account together with the funds belonging to his clients. The purpose of this practice was to provide a "margin" against the possibility of the account being overdrafted. This practice clearly offends present rule 8-101 (and former rule 9), Rules of Professional Conduct. (See also *Silver* v. *State Bar* (1974) 13 Cal.3d 134, 145, fn. 7 [117 Cal.Rptr. 821, 528 P.2d 1157].)

Rule 8-101 is violated merely by an attorney's commingling of his clients' money with his own, or by his failure to deposit and manage such money in the manner designated by the rule even if no person is injured. (*Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 858 [100 Cal.Rptr. 713, 494 P.2d 1257]). However, in this case, petitioner's misconduct has caused his clients considerable injury. Further, similar misconduct was part of the basis for discipline imposed on petitioner in *Jackson I.*

In *Jackson I,* we recognized certain mitigating circumstances which justified imposing a suspension rather than disbarment. Among these was petitioner's then lack of prior discipline, his partial restitution of the misappropriated funds, certain emotional strains, and his age. (*Jackson I, supra,* at p. 514.) Persuasive mitigating factors do not appear on the

present record. It should be noted that petitioner made no voluntary restitution in either the Sillard or Layton matters. Further, his misappropriation of Mrs. Layton's monies took place *after* the State Bar's investigation in *Jackson I* had begun.

It is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that petitioner comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.