[S.F. 24571. May 10, 1984.]

ROBERT M. CHEFSKY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Robert M. Chefsky, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Philip Martin and Michael Fox for Respondent.

OPINION

THE COURT.[*]—This is a proceeding to review the recommendation of the State Bar of California that petitioner, Robert M. Chefsky, be disciplined for (1) misappropriating funds, (2) failing to perform services for or to communicate with several clients, and (3) withdrawing from representation without taking steps to prevent prejudice to his clients. All the acts of misconduct occurred during the second half of 1978 and the first half of 1979.

## I.

Petitioner was admitted to the practice of law in California on June 17, 1959. He has been a member of the California bar continuously since that date with no prior record of discipline.

On November 19, 1981, petitioner was charged with a number of statutory and rule violations with regard to the affairs of five clients: (1) Business and Professions Code section 6067[1] (failure to discharge his duties to the best of his knowledge and ability); (2) section 6103 (wilful violation of a court order); (3) section 6106 (commission of an act involving moral turpitude, dishonesty or corruption); (4) rule 2-111(A)(2) of the Rules of Professional Conduct[2] (withdrawal from employment without taking steps to avoid prejudice to client); (5) rule 2-111(A)(3) (withdrawal from employment without refunding any unearned portion of fees paid in advance); (6) rule 6-101(2) (wilful or habitual failure to use reasonable diligence and best judgment to accomplish the purpose for which he was employed); (7) rule 7-105(1) (misleading a court by a false statement of fact or law); (8) rule 8-101(A) (commingling funds); and (9) rule 8-101(B)(4) (failure promptly to pay, on request, funds in his possession which belong to his client).

 Following a hearing,[3] the panel issued detailed findings which are described below. Further, the panel found that petitioner habit-

---

*Before Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Backus, J.†

[1]All statutory references are to the Business and Professions Code unless otherwise indicated.

[2]All references to rules are to the Rules of Professional Conduct of the State Bar of California unless otherwise indicated.

[3]Petitioner moved to dismiss the counts relating to four of the five clients because the acts complained of occurred more than two years before the charges were filed. His motion was based on rule 512, Rules of Procedure of the State Bar. ("The [bar against formal proceedings which is normally created by a staff decision not to institute such proceedings] does not apply if . . . in the case of a decision by a staff attorney, the chief trial counsel determines

---

†Assigned by the Chairperson of the Judicial Council.

ually violated rules 6-101(2) and 2-111(A)(2), and that this conduct involved an act of moral turpitude (§ 6106).

The hearing panel recommended that petitioner be suspended for three years; that the execution of the order of suspension be stayed, and that he be placed on probation for a period of three years. The conditions of probation included actual suspension for one year, restitution of sums advanced by a former client, quarterly reports to the State Bar Court, and passage of the Professional Responsibility Examination within one year.

With the exception of three findings of moral turpitude for allegedly falsely testifying before the hearing panel, the review department adopted the hearing panel's findings and recommended discipline.

## II.

Petitioner challenges many of the hearing panel's findings. The scope of this court's review is well-established. ■■■ " 'Findings by the local committee and the Disciplinary Board are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. All reasonable doubts will be resolved in favor of the accused . . . . [Par.] The findings, however, must be given great weight, and "When the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony." . . . ■■■ The burden is on the petitioner to show that the findings are not supported by the evidence or that the recommendation is erroneous. . . . In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty.' " (*Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257], citations omitted.)

---

within two years of such determination that further investigation should be conducted . . . .") As petitioner conceded before the hearing panel, rule 512 does not apply in his case for there was no earlier decision not to institute formal proceedings. He argues, however, that the rule should be construed as a two-year "statute of limitations," since lengthy delays in State Bar proceedings make it difficult to defend against charges of misdeeds long past.

Nothing in rule 512 supports petitioner's claim. Furthermore, "[t]he passage of time in itself is neither a denial of due process nor a jurisdictional defect [citations], absent a showing of specific prejudice [citation]." (*Wells* v. *State Bar* (1978) 20 Cal.3d 708, 715 [144 Cal.Rptr. 133, 575 P.2d 285]; see also Annot., Attorneys at Law: Delay in Prosecution of Disciplinary Proceeding as a Defense or Mitigating Circumstance (1979) 93 A.L.R.3d 1057.) Here, the sole argument of prejudice which petitioner presented to the hearing panel related to a factual issue which was ultimately resolved in his favor. Accordingly, he may not challenge the imposition of discipline on this ground.

*The Martha F. Matter*

In August 1978, Martha F. retained petitioner to take possession of and distribute an inheritance which had been left in a savings account by her deceased mother, Rosa H.[4] Petitioner spoke with an officer of the bank, who then sent him a cashier's check for the full amount of the inheritance, along with a letter containing the names and addresses of the six surviving children. Petitioner deposited the money in his trust account, except for $100 which he retained by agreement as his fee for the distribution.

Ms. F. heard nothing further from petitioner after August of 1978. Neither she nor any of the other heirs received checks from him. She repeatedly left messages with his answering service, and on one occasion she went to his office and left a note under his door. Petitioner did not respond to any of her messages.

In April 1979, Ms. F. filed a claim for the undistributed estate in small claims court. Petitioner did not appear, and Ms. F. was awarded a default judgment on May 21st. On June 26th, petitioner appeared at judgment debtor examination proceedings. He stated to the judge that he had the money and that he would write Ms. F. a check for the full amount as soon as he returned to his office. As a result, the court ordered the case dropped from the calendar.

A week later, Ms. F. had not received the check so she commenced proceedings to attach petitioner's bank account to satisfy the judgment. She eventually received $449.56 from his commercial account. At the State Bar hearing, petitioner gave Ms. F. a money order for the balance.

Petitioner's defense was that Ms. F. wanted him to turn over the entire fund to her, and he was concerned about his liability to the other heirs if he did so. He testified that he wrote several letters trying to locate heirs for whom he did not have current addresses and to ascertain the wishes of the other heirs about turning over the entire fund to Ms. F.[5] However, at the State Bar hearing he was unable to ascertain from reviewing his own file whether he had received responses from the other heirs. He explained that his secretary quit in November of 1978, and thereafter he had only part-

---

[4]Rosa H. died intestate in 1975, leaving seven children, one of whom died in 1976.

[5]At the time of the judgment debtor hearing, petitioner was still concerned about obtaining a release from the other relatives. He tried to talk about this with Ms. F. at that hearing, but she refused to talk to him. However, testifying at the State Bar proceedings, the judge recalled that petitioner had made an unconditional promise to pay the full sum to Ms. F. The judge also noted that petitioner did not at any point move to set aside the default judgment which Ms. F. had taken against him.

time or temporary secretarial help. He did not regularly open or file his mail after the beginning of 1979.

At the time petitioner told the court that he would send Ms. F. the check he had sufficient funds to do so. However, at the State Bar hearing, he could not remember whether those funds had been in his trust account or elsewhere. Bank records in evidence before the hearing panel revealed that in September and December of 1978, the balance in his trust account fell below the amount which he was holding for the Rosa H. heirs. No 1979 records were offered into evidence.

The hearing panel found that petitioner violated his oath to discharge faithfully his duties as an attorney (§ 6067) and his duty to maintain the respect due to the courts of justice and judicial officers (§ 6103), and that he failed to use reasonable diligence to accomplish the purpose for which he was employed. (Rule 6-101(2).) It also found that he committed acts of moral turpitude and dishonesty in three respects: by commingling and misappropriating his client's funds (rule 8-101(A)); by failing promptly to pay out these funds to Ms. F. when she requested them (rule 8-101(B)(4)); and by making a false statement of fact to the court to seek to mislead it (rule 7-105(1)). (See § 6106.)

█ Petitioner challenges the three findings of moral turpitude. He argues that no moral turpitude was involved in commingling or misappropriating the funds which he received from the bank, since he maintained the funds in a trust account and was not aware that the account balance dropped below the amount of the Rosa H. estate. He notes that he was frequently out of town during the relevant time period and did not consistently examine his trust account records.

The record supports petitioner's claim that initially the money was properly deposited in a client trust account. However, the hearing panel's finding that it was subsequently misappropriated is also supported by legally sufficient evidence. "The fact that the balance in [that] trust account [fell] below the amount due his client will support a finding of wilful misappropriation." (*Jackson* v. *State Bar* (1979) 25 Cal.3d 398, 403 [158 Cal.Rptr. 869, 600 P.2d 1326]; *Black* v. *State Bar* (1972) 7 Cal.3d 676, 691 [103 Cal.Rptr. 288, 499 P.2d 968]; *Vaughn* v. *State Bar, supra,* 6 Cal.3d at p. 851.) And "[e]ven if petitioner's conduct were not wilful and dishonest, gross carelessness and negligence constitute a violation of an attorney's oath faithfully to discharge his duties and involve moral turpitude." (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 513 [153 Cal.Rptr. 24, 591 P.2d 47].) Furthermore, petitioner's repeated refusal to communicate with Ms. F., or to respond to her demands that he account to her for the estate, will justify a finding that

the misappropriation was wilful. (*Jackson* v. *State Bar, supra,* 25 Cal.3d at p. 403.)

Petitioner next challenges the finding that he failed promptly to pay out the funds on request. He argues that Ms. F. did not provide him with the names and addresses of the other heirs, and that she demanded the entire sum for herself. Yet the record is clear that petitioner did not take any reasonable measures to disburse the funds promptly. At most, he wrote only once to the heirs whose names and addresses had been provided by the bank. He could not recall if he had received any responses to these letters. Moreover, he did not give Ms. F. even the one-seventh of the estate to which he conceded she was entitled, nor did he send checks for the remaining shares to any of the other heirs. He failed to respond to frequent inquiries from Ms. F. as to what he was doing with the money.

■ Finally, petitioner argues that there is no substantial evidence that he made false statements to the judgment debtor court. As this is a finding on which the hearing panel heard testimonial evidence, it is entitled to great weight and will not be set aside based on petitioner's simple reassertion here of his testimony before the hearing panel. (*Vaughn* v. *State Bar, supra,* 6 Cal.3d at p. 852.)

■ Misappropriation is a serious offense. (*Gordon* v. *State Bar* (1982) 31 Cal.3d 748, 757 [183 Cal.Rptr. 861, 647 P.2d 137]; *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 798 [94 Cal.Rptr. 825, 484 P.2d 993].) Clearly it involves moral turpitude. (*Resner* v. *State Bar* (1960) 53 Cal.2d 605, 612 [2 Cal.Rptr. 461, 349 P.2d 67].) ■ Additionally, petitioner's false statement to the court that he was prepared to pay Ms. F.'s judgment at once and his concealment of any reservations or conditions to immediate payment (see *ante,* p. 122, fn. 5) plainly violated rule 7-105(1) and involved moral turpitude. (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 917-918 [180 Cal.Rptr. 831, 640 P.2d 1106]; *Davidson* v. *State Bar* (1976) 17 Cal.3d 570, 574 [131 Cal.Rptr. 379, 551 P.2d 1211].) Petitioner has not met his burden of showing that the findings of moral turpitude are unsupported by the record.

*The Annette A. Matter*

In August 1978, Annette A. paid petitioner $250 to file a petition for dissolution of marriage. Petitioner advised her to file a petition in bankruptcy since she was heavily in debt and might lose her home.

Petitioner filed the dissolution petition in September 1978, and obtained a temporary support order for Ms. A. the following February. In November

1978, Ms. A. gave petitioner $100 to pay the filing fee for her bankruptcy petition. Petitioner prepared a bankruptcy petition but never filed it.

At the State Bar hearing, petitioner maintained that the $100 was only for his services in helping her to prepare the bankruptcy petition. It did not include a filing fee, as she was to file in propria persona. However, when Ms. A. wrote to him on November 27th to confirm that she had paid $100 for a bankruptcy filing fee, he did not correct her. He also failed to respond to a February 1979 letter urging him again to file the bankruptcy petition as she was being harassed by creditors. In May of 1979, petitioner referred her to another attorney to represent her in the bankruptcy.

Early in 1979, Ms. A. was served with a complaint from Wells Fargo Bank. According to her testimony at the State Bar hearing, she sent petitioner a copy of the complaint, talked with him by telephone, and confirmed the conversation by letter in April. Petitioner failed to take any action, either to defend against the Wells Fargo suit or to file the bankruptcy petition which would have stayed the Wells Fargo matter. Ultimately, Wells Fargo obtained a default judgment against Ms. A. As the bankruptcy petition had not yet been filed, a lien was placed against her home for the judgment.

Meanwhile, Ms. A.'s husband had fallen behind in his support payments. Petitioner failed to return any of her phone calls about this matter or to take any action after February of 1979. In July, Ms. A. retained a new attorney for the dissolution. The new attorney was unable to obtain petitioner's signature on a substitution agreement and ultimately obtained an order of substitution from the court. When Ms. A. went to petitioner's office to pick up her file, she found his door padlocked.

The hearing panel found that petitioner performed minimal or no services on the dissolution case after February 5th. It found that he failed to execute the substitution and failed to return his client's file and documents. It also found that Ms. A. had paid petitioner to file—not merely to prepare—her petition in bankruptcy. As to both matters, the panel found that by failing to provide services or to communicate with Ms. A., petitioner had abandoned his client. It also found that petitioner refused to refund the $100 bankruptcy filing fee which Ms. A. had advanced him.

The hearing panel found that Ms. A. provided petitioner with the legal pleadings in the Wells Fargo suit, that he had agreed to "take care of it," that he had performed no services on her behalf, and failed to communicate reasonably with his client.

These factual findings amply support the hearing panel's conclusion that petitioner violated (1) section 6067 in all three cases; (2) rule 2-111(A)(2)

in the dissolution case; and (3) rule 6-101(2) in the bankruptcy and Wells Fargo cases.[6]

Petitioner's major attack is on the finding that he promised to file a bankruptcy petition for Ms. A. Specifically, he contends that Ms. A. submitted to the State Bar an altered copy of the receipt which he gave her in November 1978 for the disputed $100 payment. He claims she typed the words "Bankruptcy Filing Fee" onto this receipt for the hearing. Petitioner has furnished this court with what he asserts is the original of the receipt which does not include the typed words. He states that he did not discover this original until after the hearing was concluded.[7]

While this court may receive additional evidence under proper circumstances (Code Civ. Proc., § 909), it is not appropriate to do so here. The only justification which petitioner offers for his failure to present the "original" receipt at the time of the hearing is the disorganized state of his files—the very problem which apparently led to his disciplinary violations. Furthermore, the original receipt, without the typed words on it, does not substantially undermine the panel's finding that he did undertake to file Ms. A.'s bankruptcy petition.

Petitioner himself testified that he originally agreed to file the petition, and later told Ms. A. that she should file it herself. The panel implicitly found that he did not communicate to Ms. A. his subsequent decision not to file the petition. This finding is amply supported by Ms. A.'s letters and petitioner's own conduct in referring her to another attorney to file for bankruptcy. The state of the original receipt does not contradict any of this evidence.

■ However, the hearing panel's finding that petitioner failed to return the $100 to Ms. A. on demand (rule 8-101(B)(4)) is not supported by the record. Although Ms. A. testified that petitioner had not refunded this money, she did not testify that she had asked him to do so. While the record could support a conclusion that petitioner's conduct amounted to a violation of rule 2-111(A)(3)[8] it does not indicate that he failed to "[p]romptly pay

---

[6]The review department overturned the hearing panel's factual finding that petitioner had falsely claimed that he had no knowledge of the Wells Fargo suit. It also overturned the panel's conclusion that he committed an act of moral turpitude by testifying falsely concerning his promise to file the bankruptcy petition.

[7]It should be noted that petitioner did call to the panel's attention the fact that the words "Bankruptcy Filing Fee" had been typed onto the receipt, and the rest of the receipt was handwritten. Thus, the panel may well have agreed with petitioner that the typed words were a later addition.

[8]"A member of the State Bar who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned. . . ."

or deliver to the client as requested by a client the funds . . . which the client is entitled to receive." (Rule 8-101(B)(4).) Therefore, that finding must be set aside.

Petitioner also challenges the finding that he failed to respond to the Wells Fargo complaint. Essentially he contends that Ms. A. did not notify him that a complaint had been filed. The hearing panel heard testimony from both Ms. A. and petitioner on this point. Evidently, it resolved the credibility contest in her favor. ▮▮▮ Findings which rest primarily on testimonial evidence are to be accorded deference. (*Vaughn* v. *State Bar, supra,* 6 Cal.3d at p. 852.) Accordingly, petitioner's simple assertion that Ms. A.'s testimony is untrue does not compel this court to set aside that finding.

Petitioner also disputes the panel's findings on the dissolution matter. He argues that no action on the case was necessary between February and July of 1979. This argument is refuted by Ms. A.'s request for assistance in April of 1979, to enforce her temporary support order against her husband. Whether or not petitioner could have succeeded in obtaining additional support payments for Ms. A., the record indicates that he did not even consider attempting to do so. Even assuming that he did decide that efforts to enforce the order would be fruitless, this would not justify a failure to communicate his decision to Ms. A. or to cooperate with her new counsel.

Even if Ms. A. were not actually prejudiced by petitioner's failure to communicate concerning the dissolution case, it is clear that she was seriously harmed by his refusal to speak with her about the bankruptcy and Wells Fargo matters. There can be no justification for his silence and inattention during these months. ▮▮▮ As the court has held, "[f]ailure to communicate with, and inattention to the needs of, a client are proper grounds for discipline." (*Spindell* v. *State Bar* (1975) 13 Cal.3d 253, 260 [118 Cal.Rptr. 480, 530 P.2d 168, 80 A.L.R.3d 1231].) Thus, the State Bar's findings that petitioner failed to communicate reasonably with his client are supported by the record.

*The Rosie G. Matter*

In the spring of 1978, Ms. G. retained petitioner to "appeal" one provision of a property settlement which had been entered as part of a dissolution proceeding against her second husband. She also wanted petitioner to pursue a claim for child support against her first husband.

After she retained petitioner, he repeatedly failed to return her calls. He also failed to keep appointments to see her. He did at some point discuss the property settlement with Ms. G.'s former attorney, and he succeeded in

getting this attorney to attempt to have the objectionable provision set aside. He also attempted to ascertain whether more child support could be obtained from the first husband, who lived in Southern California and was on disability at the time.

In 1979, Ms. G. consulted the local Legal Aid office about the dissolution and child support cases. Legal Aid attorneys wrote and telephoned petitioner several times during the summer of 1979 in an effort to obtain Ms. G.'s file. Petitioner failed to respond to the letters and calls.

At the hearing, petitioner testified that he did not remember receiving any of the Legal Aid letters for they were sent to his Oakland office after he moved to Hayward. He also claimed not to remember any of the telephone calls. However, he admitted that he was aware that Legal Aid was seeking Ms. G.'s file. He testified that he did not actually have a file, but only some letters which he had written in connection with the child support claim against Ms. G.'s first husband. However, as the Legal Aid letters indicate, petitioner did agree to turn over whatever materials he had in his possession but failed to do so.

The hearing panel rejected the State Bar's allegations that petitioner did minimal or no work for Ms. G. and that he kept an unearned portion of her fee. However, the panel did find that petitioner wilfully and intentionally violated rule 2-111(A)(2) in failing to return her file and documents.

Petitioner does not challenge this finding.

*The Vilather H. Case*

In April of 1978, Ms. H. retained petitioner to represent her in a personal injury action arising from an automobile accident with an uninsured motorist. Ms. H. had both uninsured motorist coverage as well as coverage for her own medical expenses arising from the accident.

After investigating the accident, petitioner notified the insurance carrier that Ms. H. would pursue the claim for medical expenses on her own. She subsequently received reimbursement for these expenses from the carrier.

However, petitioner failed to pursue the uninsured motorist claim against the insurer or to bring an action against the uninsured motorist within the one-year statute of limitations.

Ms. H. repeatedly tried to contact petitioner. More than a year after she had retained him, she spoke to him by telephone and asked that he return

her file. She never received the file and did not hear from him again. At some point after this conversation, she went to his office in Oakland and found the door padlocked. She testified that she was never made aware of the statute of limitations nor of the fact that no action had been filed.

In his defense, petitioner testified that he had a practice of informing clients of the statute of limitations on any accident claim. He also testified that Ms. H. had received notice about the statute of limitations directly from the insurer. Finally, he testified that he had investigated the uninsured motorist claim and had found it to be meritless.[9] The file bore an entry, "Told Vilather without proof of loss of earnings her case is minimal. Close file."

The hearing panel found that petitioner abandoned his client with respect to the uninsured motorist claim; failed to notify either Ms. H. or the insurance carrier of his withdrawal from the case; and failed to advise her of her obligation to act within the statutory time period. It found that he failed to protect her cause of action by timely filing a claim, and he failed to notify her of the true state of affairs when she made inquiries after the statute of limitations had expired. He frustrated her attempts to communicate with him by closing his office without giving her notice, and he failed to respond to her request to return her file. On these facts, the panel concluded that petitioner violated his oath to discharge his duties as an attorney (§ 6067); that he failed to use reasonable diligence to accomplish the purpose for which he was employed (rule 6-101(2)); and that he withdrew from employment without taking reasonable steps to protect his client (rule 2-111(A)(2)).

Petitioner argues that he never executed a retainer agreement and that, in any event, Ms. H. was not prejudiced because her medical bills were ultimately paid and her other claims were meritless.

In support of his first argument, he notes that the copy of the retainer agreement which the State Bar placed into evidence did not bear his signature. However, the record includes a letter from petitioner to Ms. H., dated April 18, 1978, requesting her to sign and return a copy of the retainer agreement. The record also includes correspondence between petitioner and

---

[9]An "independent witness" to the accident, whose name Ms. H. had given him, was in fact a friend of Ms. H.'s. On reading the accident reports, petitioner concluded that Ms. H. was at least partially at fault. He further concluded that no claim for lost wages could be documented, as Ms. H. received her wages in cash, and could not produce a credible record of her income. Though Ms. H. showed petitioner some income tax records, she proposed to document her wage claim not through the tax records but through handwritten entries in a notebook which she kept. After talking with Ms. H.'s employer, petitioner concluded that the claim for lost wages was "hyped up." Moreover, Ms. H. had a prior history of issuing bad checks. Thus, he did not think she would make a credible witness.

the insurer, in which he held himself out as Ms. H.'s attorney. Moreover, by his own testimony petitioner acted, at least through August of 1978, as though he represented Ms. H. on the uninsured motorist claim. These facts support a finding that a contract of employment was in effect.

However, the hearing panel's findings that petitioner abandoned Ms. H. and withdrew from employment without taking steps to protect her are not supported by the weight of the evidence. Petitioner recalled specifically that he told Ms. H. in September of 1978 that the case was not worth pursuing without proof of loss of earnings and that he was closing her file. He documented this recollection with an entry in the file.

Against this entry, Ms. H. offered only a vague recollection that petitioner had promised but failed to pursue all her claims. She could not remember even approximate dates of conversations she had with him during the period of employment. She remembered showing petitioner her income tax returns, but admitted she did not furnish him copies of them or of any other records. While it is clearly better practice for an attorney to confirm a decision not to pursue a claim by letter, the absence of such a letter in itself, in light of all the evidence in this case, does not support a conclusion that Ms. H. had no notice of petitioner's decision.

Accordingly, the findings that petitioner violated rules 2-111(A)(2) and 6-101(2) are set aside.

*The Sam S. Case*

In June 1978, Sam S. retained petitioner to represent him in two pending cases. The first was a dissolution case involving the custody of two minor children. The second was a criminal case in which Mr. S. was charged with misdemeanor violations of Penal Code sections 243 and 245, subdivision (a).

In the criminal case, petitioner failed to appear at five scheduled court appearances without notifying either Mr. S. or the court of the reasons for his absence. On three of these dates, the case was either set for jury trial or was on calendar for trial setting. (On two of these three dates, according to the court's minute orders, Mr. S. was absent as well.) Subsequently, on April 4, 1979, petitioner appeared in court with Mr. S., who entered a negotiated plea to a reduced charge of simple battery. (Pen. Code, § 242.) Petitioner failed to appear in court for sentencing on May 17, 1979, and again on May 24th. Petitioner failed to return Mr. S.'s phone calls when Mr. S. telephoned to ask why he had been absent. On May 31st, when

petitioner appeared late for the continued sentencing hearing, the court appointed substitute counsel to represent Mr. S.

In the dissolution case, petitioner failed to appear without notice or explanation at a hearing on March 29, 1979, at which the court considered a supplemental probation officer's report concerning arrangements for Mrs. S.'s visits with the children. (Mr. S. had physical custody of the children.) At the hearing Mr. S. retained physical custody with no substantial modification of his former wife's visitation rights.

At the State Bar hearing, petitioner explained that his pre-plea absences in the criminal case were with the consent of the deputy district attorney and the court clerk. Since the criminal charges arose from an assault by Mr. S. on his wife, petitioner and Mr. S. had agreed that it was best to continue this case until the dissolution proceedings—which involved a dispute about child custody—were completed. The deputy district attorney agreed to this. The pre-plea court dates were mere formalities since all parties understood that the case would be continued.

Petitioner admitted that his absences at the sentencing hearings in May of 1979 and at the child custody hearing in March of 1979 were unintentional. They were due either to illness or to the fact that he was in the process of closing his Oakland office. Petitioner observed, however, that in each case Mr. S. received the most favorable disposition under the circumstances.

The hearing panel found that in both cases petitioner violated his oath to discharge his duties as an attorney (§ 6067); that he violated his duty to maintain the respect due to courts and judges (§ 6103); that he failed to use reasonable diligence to accomplish the purpose for which he was employed (rule 6-101(2)); and that he withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client (rule 2-111(A)(2)).

Though petitioner does not challenge these findings, a review of the record shows that the last finding is not supported by the evidence. Petitioner's failure to appear without notice cannot be condoned, but it did not amount to withdrawal from either case. Accordingly, this finding will be set aside.

### III.

Petitioner maintains that the recommended discipline of one year of actual suspension is too severe in light of the mitigating circumstances. This court agrees.

██ "Although the State Bar's recommendation as to discipline is entitled to great weight . . . we exercise our independent judgment in determining the appropriate punishment for professional misconduct . . . ." (*Gordon* v. *State Bar, supra,* 31 Cal.3d at p. 757, citations omitted.) "Our principal concern is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standard for attorneys." (*Jackson* v. *State Bar, supra,* 23 Cal.3d at p. 514.)

██ All of petitioner's violations occurred within a relatively short time period, mid-1978 to mid-1979. For several reasons, this appears to have been aberrant behavior, not typical of his performance during his career both before and after these incidents. ██ Prior to 1978-1979, petitioner had practiced law for nearly 20 years with no disciplinary record.[10] ██ Petitioner was ill during much of 1978 and 1979 (see *Doyle* v. *State Bar* (1976) 15 Cal.3d 973, 979 [126 Cal.Rptr. 801, 544 P.2d 937]), and this undoubtedly compounded the difficulties he encountered maintaining a law practice consisting mainly of low-fee cases. (See *Jackson* v. *State Bar, supra,* 23 Cal.3d at p. 514; *Vaughn* v. *State Bar, supra,* 6 Cal.3d at pp. 857-858.) Certainly, the loss of a full-time secretary in the fall of 1978 added to his problems.

Furthermore, petitioner was attempting to relocate his practice, and he did move his office to Hayward in the spring of 1979. This move caused a disruption in his mail service.

Also, the last violation complained of occurred nearly five years ago. While the delay in initiating formal proceedings against petitioner is not a bar to the imposition of discipline, it is a factor to consider in deciding what discipline is appropriate. (*Hawkins* v. *State Bar* (1979) 23 Cal.3d 622, 628 [153 Cal.Rptr. 234, 591 P.2d 524].)

The panel noted petitioner's testimony that at least three of the complaining clients were "unpleasant, self-serving, disreputable, and/or dishonest." ██ The difficulty of dealing with such clients has been acknowledged as a mitigating factor. (*Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 918 [101 Cal.Rptr. 369, 495 P.2d 1289].)

██ Thus, while petitioner's offenses—particularly in the case of Annette A.—are serious and compel discipline, "[t]he imposition of penalty

---

[10]The absence of a prior disciplinary record is in itself an important mitigating circumstance. (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337].)

does not issue from a fixed formula but from a balanced consideration of the relevant factors." (*Bernstein* v. *State Bar, supra,* 6 Cal.3d at p. 919.) In light of the factors in mitigation, it appears that 30 days actual suspension is sufficient.

Accordingly, it is ordered that petitioner be suspended from the practice of law for three years; that the execution of this order of suspension be stayed; that petitioner be placed on probation for a three-year period with conditions of probation to include actual suspension for the first thirty days, and restitution to Annette A. in the amount of $100. Petitioner is also ordered to comply with the other conditions of probation set forth in the review department's order. Petitioner is required to take and pass the Professional Responsibility Examination by June 9, 1985.

**REYNOSO, J.,** Concurring and Dissenting.—Petitioner, I agree, should be disciplined. The panel's recommendation, including one year actual suspension, is appropriate. I would accept that recommendation rather than the 30 days actual suspension imposed by the majority.

**BACKUS, J.,**\* Concurring and Dissenting.—I agree with the majority that petitioner should be disciplined and I further agree that in light of the mitigating circumstances the recommended discipline of one year's actual suspension is too severe. I cannot, however, ignore the hearing panel's finding that in three instances petitioner testified falsely before the hearing panel when such findings are based upon substantial objective evidence in the record. This court has recognized that such false testimony is a serious aggravating factor to be taken into consideration in imposing discipline. (*Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 23 [126 Cal.Rptr. 801, 544 P.2d 937]; *Worth* v. *State Bar* (1978) 22 Cal.3d 707, 711 [130 Cal.Rptr. 712, 551 P.2d 16].) Taking such factors into consideration, it is my view that a 30-day period of actual suspension is insufficient and amounts to no more than an enforced vacation. I would impose an actual period of suspension of 90 days.

---

\*Assigned by the Chairperson of the Judicial Council.